IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
July 8, 2021 Session

## RONALD WHITFORD ET AL. v. VILLAGE GROOMER & ANIMAL INN, INC.

**Appeal from the Chancery Court for Montgomery County**
**No. MC-CH-CV-RE12-20        Ted A. Crozier, Judge**

_____

### No. M2020-00946-COA-R3-CV

_____

A property owner filed suit against the owners of a neighboring property, alleging that the neighbors had created a nuisance and trespassed by diverting surface water onto his property and causing a sinkhole to develop. After a trial on the matter, a jury returned a verdict finding that the neighbor had not created a nuisance and had not trespassed. The trial court judge confirmed the jury's verdict and dismissed all claims against the neighbor with prejudice. Because the record contains material evidence supporting the jury's verdict, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and W. NEAL MCBRAYER, J., joined.

William Timothy Harvey, Clarksville, Tennessee, for the appellant, Ronald E. Whitford.[1]

Kenneth W. Ward and Hannah Sylvia Lowe, Knoxville, Tennessee, and Amy Victoria Peters, Oklahoma City, Oklahoma, for the appellee, Village Groomer and Animal Inn, Inc.

### OPINION

#### FACTUAL AND PROCEDURAL BACKGROUND

This case involves a dispute between adjoining property owners, Dr. Ronald Whitford and Village Groomer and Animal Inn, Inc. ("Village Groomer"), over damages allegedly caused by diverted water. Prior to 2002, a man, referred to in the record only as Mr. Grant, owned the two properties as one parcel in Clarksville, Tennessee. The southern

_____
[1] Individually and d/b/a St. Bethlehem Animal Clinic.

section of the property was naturally situated at a higher elevation than the northern section, causing any surface water to flow across the property from South to North. At some point, Mr. Grant installed two storm water drains on the northern section of the property to capture surface water and divert it away from the northern section. He also constructed a large shed on the southern section of the property that had three gutters directing rainwater toward the two storm drains on the northern section. Ultimately, Mr. Grant subdivided the property: the storm drains were located on what would become Dr. Whitford's property, and the shed was located on what would become Village Groomer's property.

After purchasing the northern section from Mr. Grant in 2002, Dr. Whitford constructed two buildings on the property for his veterinary practice: a building at the front of the property for his animal clinic ("Suite A") and a building at the rear for grooming and boarding ("Suite B"). Prior to construction commencing, Village Groomer agreed to lease Suite B from Dr. Whitford for use in its grooming and boarding business. Village Groomer moved into Suite B upon its completion in 2002 and continued to occupy the premises until early 2009.

Village Groomer purchased the southern section in 2007 and, following Dr. Whitford's termination of the parties' lease in 2008, Village Groomer modified the existing shed, constructed an additional building, and installed three dog runs for its grooming and boarding business.[2] Like the gutters on the pre-existing shed, some of the gutters on the new building directed rainwater toward the storm drains on Dr. Whitford's property. Village Groomer began operating from this property in 2009.

In 2011, Dr. Whitford became concerned about the development of several major cracks in the interior and exterior walls of Suite B. Thinking the damage could be due to a leak in a sewer line beneath the building's concrete slab, Dr. Whitford hired a plumber to investigate. When the plumber removed a section of the concrete slab, he did not discover a leaking sewer line, but rather, a cavity beneath Suite B. Dr. Whitford then hired a structural engineer, Edward Neely, to examine Suite B. After overseeing various testing of the property, Mr. Neely concluded that the damage to Suite B was due to a sinkhole developing under the property which caused the building to sink two and half to three feet. Mr. Neely then recommended that Dr. Whitford make certain costly repairs, which Dr. Whitford made, to stabilize the building.

In 2012, Dr. Whitford filed a complaint against Village Groomer alleging that Village Groomer had created a nuisance by diverting water and animal sewage onto his property and causing a sinkhole to develop under Suite B. Specifically, Dr. Whitford claimed that downspouts on Village Groomer's new building "transfer[red] the roof runoff directly onto [his] property" and that the "constant running of water" in the three dog runs

---

[2] The dog runs were enclosed outdoor spaces where Village Groomer allowed dogs to play and exercise.

"result[ed] in a downward flow of feces, urine and water underground to [his] property creating [the sinkhole]" and foul odors.

The case was tried before a jury over the course of four days in November 2019. At the conclusion of all the proof, the trial court permitted Dr. Whitford to amend his complaint to add a claim for temporary and permanent trespass, instructed the jury on the law of nuisance and trespass, and dismissed the jurors for deliberations. The jury returned a verdict finding that Village Groomer had not created a temporary nuisance and had not trespassed onto Dr. Whitford's property by diverting water onto his property. The trial court entered an order on December 9, 2019, confirming the jury's verdict and dismissing all claims against Village Groomer with prejudice. Dr. Whitford then filed a motion for a new trial which was denied.

Dr. Whitford timely appealed and presents two issues for our review that we restate as follows: whether there is any material evidence to support the jury's verdict that Village Groomer did not create a nuisance by directing water onto Dr. Whitford's property and whether there is any material evidence to support the jury's verdict that Village Groomer did not trespass onto Dr. Whitford's property by diverting water onto his property.

STANDARD OF REVIEW

In a civil action tried by a jury, an appellate court's review of the factual findings is limited because the jury's findings of fact "shall be set aside only if there is no material evidence to support the verdict." TENN. R. APP. P. 13(d). The Tennessee Supreme Court has explained this limited scope of review as follows:

> It is the time honored rule in this State that in reviewing a judgment based upon a jury verdict the appellate courts are not at liberty to weigh the evidence or to decide where the preponderance lies, but are limited to determining whether there is material evidence to support the verdict; and in determining whether there is material evidence to support the verdict, the appellate court is required to take the strongest legitimate view of all the evidence in favor of the verdict, to assume the truth of all that tends to support it, allowing all reasonable inferences to sustain the verdict, and to discard all to the contrary. Having thus examined the record, if there be any material evidence to support the verdict, it must be affirmed; if it were otherwise, the parties would be deprived of their constitutional right to trial by jury.

*Crabtree Masonry Co., Inc. v. C & R Constr.*, 575 S.W.2d 4, 5 (Tenn. 1978); *see also Barnes v. Goodyear Tire & Rubber Co.*, 48 S.W.3d 698, 704-05 (Tenn. 2000), *abrogated on other grounds by Gossett v. Tractor Supply Co., Inc.*, 320 S.W. 3d 777 (Tenn. 2010). We review questions of law de novo with no presumption of correctness. *Anderson v. Am. Limestone Co., Inc.*, 168 S.W.3d 757, 760 (Tenn. Ct. App. 2004).

ANALYSIS

I. Nuisance.

Dr. Whitford first asserts that there is no material evidence in the record to support the jury's finding that Village Groomer did not create a temporary nuisance by diverting water onto his property.[3] The Tennessee Supreme Court has explained what constitutes a nuisance as follows:

> A common-law nuisance is a tort characterized by interference with the use or enjoyment of the property of another. A nuisance is anything that annoys or disturbs the free use of one's property or that renders the property's ordinary use or physical occupation uncomfortable. It extends to everything that endangers life or health, gives offense to the senses, violates the laws of decency, or obstructs the reasonable and comfortable use of the property.

*Shore v. Maple Lane Farms, LLC*, 411 S.W.3d 405, 415 (Tenn. 2013) (citations omitted). In cases involving surface water, a property owner creates a nuisance when he wrongfully interferes with "the natural flow of water across his land in a manner that causes flooding on adjacent property." *Shearron v. Tucker Corp.*, No. M2000-00624-COA-R3-CV, 2001 WL 1158897, at *4 (Tenn. Ct. App. Oct. 2, 2001); *see also Manis v. Gibson*, No. E2005-00007-COA-R3-CV, 2006 WL 521466, at *5 (Tenn. Ct. App. Mar. 3, 2006). As relevant here, if a property is situated at a higher elevation than adjoining properties, the owner of the higher land will be liable for all damages to the possessors of lower lands if he or she changes the natural condition of his or her property "so that surface waters collect and pour in concentrated form or in unnatural quantities upon lower lands." *Zollinger v. Carter*, 837 S.W.2d 613, 614-15 (Tenn. Ct. App. 1992); *see also Shearron*, 2001 WL 1158897, at *4.

There are two types of nuisance: temporary and permanent. A temporary nuisance is one that "can be corrected by the expenditure of labor or money" and the damages to the property "are recurrent and may be recovered from time to time until the nuisance is abated." *Pate v. City of Martin*, 614 S.W.2d 46, 48 (Tenn. 1981); *see also Clabo v. Great Am. Resorts, Inc.*, 121 S.W.3d 668, 671 (Tenn. Ct. App. 2003). "A permanent nuisance is one that is 'presumed to continue indefinitely, and is at once productive of all the damage which can ever result from it. . . .'" *Clabo*, 121 S.W.3d at 671 (quoting *Caldwell v. Knox Concrete Prods., Inc.*, 391 S.W.2d 5, 11 (Tenn. 1964)).

The record in this case contains ample evidence that Village Groomer did not wrongfully change the natural flow of surface water across its property in a way that caused

---

[3] Initially, Dr. Whitford sought damages for both temporary and permanent nuisance. At the close of all the proof, however, he elected to pursue only a claim for temporary nuisance. Thus, the trial court did not instruct the jury on the law of permanent nuisance.

the water to flood or pour in unnatural amounts upon Dr. Whitford's property, creating a sinkhole beneath Suite B. We will begin with the evidence regarding Village Groomer's shed and new building. Dr. Whitford admitted that the natural topography of the two properties had always sloped from Village Groomer's property toward his property. Furthermore, he stated that the shed on Village Groomer's property existed prior to Village Groomer purchasing the property and that water from the gutters on the shed had always flowed down the slope and onto his property. Michael Gee, a representative of Village Groomer, testified that, when Village Groomer constructed its new building, it did not change these natural drainage patterns in a way that caused water to pour in increased amounts upon Dr. Whitford's property. Indeed, Mr. Gee stated that Village Groomer constructed the new building such that "[a] whole lot of water got diverted away from [Dr. Whitford's] property" because much of the water that fell on the new building's roof was directed into a drainage ditch on Village Groomer's property. Although Village Groomer admittedly pointed some of the gutters on the new building toward Dr. Whitford's property, Mr. Gee explained that those gutters did not cause an increase in water on Dr. Whitford's property because they directed water into the pre-existing storm drains on Dr. Whitford's property.

Testifying as an expert witness on behalf of Dr. Whitford, Mr. Neely agreed that the pre-existing storm drains on Dr. Whitford's property functioned to capture surface water naturally flowing from South to North onto Dr. Whitford's property. Mr. Neely further agreed that the gutters on the northern side of Village Groomer's new building drained in line with the pre-existing storm drains, which was a desirable outcome. Dr. Whitford acknowledged that he had repaired those storm drains years before Village Groomer constructed its new building and that they had never backed up since he purchased his property.

Kurt Bergman testified as an expert witness for Village Groomer. He opined that Village Groomer's new building did not cause any measurable increase in surface water flowing onto Dr. Whitford's property. In fact, he believed that the new building may have caused a reduction in the amount of surface water flowing onto Dr. Whitford's property:

> [B]asically, prior to [Village Groomer's new building] right here being built on the right, rainwater was coming down this slope and along towards this property line. And presuming that these stormwater features were there at that time, they would have collected such stormwater.
> After this building was built, you have the same rainwater in the same area. There may have been actually some that was - - it may have actually reduced because there may be some other water that was diverted off the other side of the property. But basically, you're ending up with the same moist - - the same rainfall coming to the same property line going into the same features.

Thus, material evidence existed to support a finding that, after Village Groomer constructed its new building, the surface water flowed in the same direction toward the pre-existing storm drains as it always had and that it did not flow in increased or unnatural quantities onto Dr. Whitford's property.

A substantial amount of the proof focused on Village Groomer's three dog runs. According to Dr. Whitford, the dog runs directed water and foul odors toward his property. Mr. Neely opined that water from the dog runs drained onto Dr. Whitford's property through a particular set of black drainpipes, substantially contributing to the formation of the sinkhole under Suite B. Mr. Neely acknowledged, however, that he only visited Village Groomer's property one time and did not conduct an in-depth investigation to study the dog runs or to determine whether the dog runs were, in fact, the source of any water draining from the black drainpipes.

Mr. Gee testified that water did not flow onto Dr. Whitford's property from Village Groomer's dog runs and that the dog runs were not the source of the foul odors Dr. Whitford complained about. Mr. Gee explained the dog runs' design as follows:

> It is designed like a septic system with a leach field. It's supposed to go straight down and dissipate. And then with what chemicals that we use for disinfecting, cleaning, upkeep of the yards, it has an enzyme in it that destroys the urine. It deodorizes it, eliminates all the scent and cleans it. We would do that on a daily basis.
> Every time a pet was walked, if it used the bathroom, [an employee] had a squirt bottle. They hit the area that it went on, whether it was pee or poop. The poop was picked up with poop scoopers and placed in a can that had a trash bag and thrown away three times a day.

He further explained that, at the end of each day, Village Groomer used a turf cleaning machine that fluffed the grass, sprayed a cleaner/deodorizer, and vacuumed all the dirty water, which was then emptied into the sewer system. According to Mr. Gee, the black pipes drained from the gutters on the back of the new building not from the dog runs. Any foul odors on the property, Mr. Gee stated, were due to Dr. Whitford turning on an industrial fan at the end of his building that would blow "noxious vapors" toward Village Groomer's property when Dr. Whitford's staff cleaned out the kennels.

The record also contains material evidence that the sinkhole conditions under Suite B existed years before Village Groomer constructed its new building. Mr. Gee testified that, within the first year of occupying Suite B, Village Groomer began to notice cracks forming in the interior and exterior walls and in the floor tiles. Village Groomer informed Dr. Whitford of these issues and, at Village Groomer's request, Dr. Whitford had his father-in-law cut an interior door that had dropped and was sticking. Dr. Whitford admitted that

he had his father-in-law cut that interior door two or three times due to settling issues while Village Groomer was a tenant in Suite B.

Village Groomer's owner, Renee Gee, testified that, from 2002 until 2009, Village Groomer observed "a large drainage issue" that caused rainwater to collect and pool beside Suite B. When Village Groomer informed Dr. Whitford of the issue, he told Village Groomer it did not "pay enough rent" for him to remedy the situation. Thus, Village Groomer, at its own expense, hired a contractor to regrade and install gravel in the area where rainwater kept pooling.

Mr. Bergman testified that the drainage issues and cracked floors and walls that Village Groomer observed during its time as a tenant in Suite B were consistent with the development of sinkhole conditions under the building. He then opined that the most significant source of surface water contributing to the creation of the sinkhole was drainage from the gutters on Suite B which had discharged onto the grass beside Suite B from the time the building was constructed in 2003 until discovery of the sinkhole in 2011. As he explained, this particular source of water "contribut[ed] an egregious amount of water and [was] also the closest" to the most significant damage caused to Suite B.

Based on the foregoing, we conclude that the jury was presented with material evidence from which it could conclude that Village Groomer did not create a temporary nuisance.

II. Trespass.

Dr. Whitford next asserts that the record does not contain material evidence supporting the jury's verdict that Village Groomer did not trespass onto Dr. Whitford's property by diverting water onto his property. This Court has defined trespass as "[a]ny unauthorized entry upon the property of another." *Heatley v. Gaither*, No. M2018-00461-COA-R3-CV, 2018 WL 6706287, at *4 (Tenn. Ct. App. Dec. 19, 2018) (citing *Morrison v. Smith*, 757 S.W.2d 678, 681 (Tenn. Ct. App. 1988)). A trespass action protects an "owner or tenant's right to exclusive possession." *Morrison*, 757 S.W.2d at 681; *see also Heatley*, 2018 WL 6706287, at *4. The holder of an easement, however, "is authorized to enter and use another's property for a specific purpose," and "[t]he right of the easement holder to use the easement outweighs the landowner's right to exclusive possession." *Heatley*, 2018 WL 6706287, at *4 (citing *Hall v. Pippin*, 984 S.W.2d 617, 620 (Tenn. Ct. App. 1998) and *Cox v. E. Tenn. Nat. Gas Co.*, 136 S.W.3d 626, 627-28 (Tenn. Ct. App. 2003)). An easement may arise by implication from a previous common ownership. *Id.* (citing *Johnson v. Headrick*, 237 S.W.2d 567, 569-70 (Tenn. Ct. App. 1948)). Such an easement runs with the land and binds subsequent landowners even if they have no knowledge of the easement. *Id.*

We again start with the evidence pertaining to water from Village Groomer's new building. There is no dispute that Village Groomer directed surface water toward Dr. Whitford's property by pointing some of the gutters on its new building toward the storm drains on Dr. Whitford's property because, as previously mentioned, Mr. Neely expressly stated that two of the gutters on the new building drained in line with the storm drains. The record contains material evidence, however, from which the jury could have concluded that this did not constitute a trespass because Village Groomer had an easement by implication to use the storm drains on Dr. Whitford's property. Specifically, Dr. Whitford admitted that the storm drains existed on the property before the original owner, Mr. Grant, subdivided it into two lots. Furthermore, the record contains material evidence from which the jury could have concluded that Village Groomer's use of the storm drains was consistent with the original purpose of the easement. *See id.* at *5 (stating that "[a]n easement holder only becomes a trespasser when the holder's use of the servient tenement is inconsistent with original purpose of the easement"). During cross-examination, Mr. Neely agreed that the purpose of the storm drains was to collect water flowing downhill onto the northern section of Mr. Grant's property from the southern section. The record, therefore, contains evidence from which the jury could have concluded that use of the storm drains was consistent with the original purpose of the easement.

The record also contains material evidence that water flowing onto Dr. Whitford's property from the shed on Village Groomer's property did not constitute a trespass due to the existence of an easement by implication. The parties acknowledged that the shed on Village Groomer's property existed before Mr. Grant subdivided the land into two lots. Dr. Whitford agreed that the gutters on the shed existed before Village Groomer purchased the property, and Mr. Gee testified that surface water had always flowed from the shed down the slope toward Dr. Whitford's property.

Dr. Whitford correctly points out that an "easement holder cannot unilaterally change or expand the easement such that the burden on the servient tenement is materially increased or a new or additional burden is imposed." *Id.* (citing *Adams v. Winnett*, 156 S.W.2d 353, 357 (Tenn. Ct. App. 1941)). According to Dr. Whitford, Village Groomer trespassed on his property because Village Groomer's new building imposed an additional burden on the easement by diverting significantly more water toward the storm drains. The record contains material evidence, however, that Village Groomer did not direct additional water toward the storm drains on Dr. Whitford's property. Indeed, Mr. Gee testified that many of the gutters on Village Groomer's new building directed surface water away from Dr. Whitford's property and into a drainage ditch on Village Groomer's property.[4] Mr. Bergman believed that Village Groomer's new building did not significantly change the natural flow of surface water which had always flowed downhill from Village Groomer's property onto Dr. Whitford's property. He opined that Village Groomer's new building

_____

[4] Mr. Gee stated that one of the gutters on the new building also directed water toward property owned by Riverside Muffler, which was adjacent to Village Groomer's and Dr. Whitford's properties.

likely reduced the amount of surface water flowing onto Dr. Whitford's property because some rainwater was diverted into a drainage ditch on Village Groomer's property rather than allowing it to flow downhill toward Dr. Whitford's property as it would have prior to construction of Village Groomer's new building.

Finally, the record contains material evidence from which the jury could have found that the dog runs on Village Groomer's property did not direct additional water onto Dr. Whitford's property. In concluding that Village Groomer's new building was a substantial factor in creating the sinkhole beneath Suite B, Mr. Neely relied on his belief that the dog runs on Village Groomer's property drained onto Dr. Whitford's property. Both Mr. Gee and Mr. Bergman testified, however, that the black pipes located under the dog runs drained from gutters on Village Groomer's new building not from the dog runs. Furthermore, Mr. Gee explained that any liquids released on the dog runs would filter down through a leach field in the special grass, but it did not drain onto Dr. Whitford's property. The liquid chemicals used to clean the dog runs were then removed by a special turf vacuum.

Based on the foregoing, we conclude that the record contains material evidence to support the jury's verdict that Village Groomer did not trespass onto Dr. Whitford's property by diverting water onto his property.

CONCLUSION

The judgment of the trial court is affirmed. Costs of this appeal are assessed against the appellant, Dr. Ronald Whitford, for which execution may issue if necessary.


_/s/ _Andy D. Bennett_____
ANDY D. BENNETT, JUDGE